**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| 520 S. MICHIGAN AVENUE ASSOCIATES, | ) | |
| LTD.d/b/a THE CONGRESS PLAZA HOTEL | ) | |
| & CONVENTION CENTER , | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 10 C 1395 |
| | ) | |
| UNITE HERE National Retirement Fund, | ) | Judge Kennelly |
| | ) | |
| Defendant. | ) | |

**CONGRESS PLAZA HOTEL'S REPLY BRIEF TO MOTION FOR**
**SUMMARY JUDGMENT AND RESPONSE BRIEF TO FUND'S**
**CROSS-MOTION FOR SUMMARY JUDGMENT**

NOW COMES Plaintiff/Counter-Defendant, 520 S. Michigan Avenue Associates, LTD.

d/b/a The Congress Plaza Hotel & Convention Center ("Congress Plaza Hotel"),  by and through

its undersigned counsel, and in response to the UNITE HERE National Retirement Fund's

Memorandum in Support of its Cross-Motion for Summary Judgment and in Opposition to

Plaintiff-Counterdefendant's Motion for Summary Judgment ("Response") as follows states as

follows:

I.      **INTRODUCTION**.

As was the case throughout this proceeding, the UNITE HERE National Retirement Fund

("Fund") supports its imposition of an almost 2.5 million dollar withdrawal liability assessment

based exclusively on the strength of a dictionary. The Fund contends that the reduction in

contribution payments by the hotel - which directly correlates with the strike's inception - does

not constitute a "suspension" as that term is used to trigger the labor dispute exemption's

application, 29 U.S.C. §1398 ("Labor Dispute Exemption"). Not a single legal authority is relied

upon by the Fund to support this unprecedented statutory interpretation. Instead, the Fund

requests that this court adopt a statutory interpretation that has never before been adopted and which effectively allows the Fund to interject itself into and disregard the existence of a genuine labor dispute simply because it concluded the dispute has lasted too long. This conduct constitutes a breach of the Fund's fiduciary duties and obligations under ERISA which prohibits a pension fund from acting with an improper motive such as attempting to advance union goals when assessing withdrawal liability. *Duer Constr. Co. v. Tri-County Bldg. Trades Health Fund*, 132 Fed. Appx. 39, 44 (6th Cir. 2005). Just as it was evident that in 2004 there was a "suspension" in contributions as that term is used in the Labor Dispute Exemption, it is equally evident now.

## II.     REPLY TO FUND'S SUMMARY OF FACTS.

The Fund's response to the hotel's statement of material facts are largely undisputed. See Unite Here National Retirement Fund's Response to Plaintiff-Counterdefendant's Rule 56.1 Statement of Material Facts ("Rule 56.1 Fund Response"), including its reference to the candid admission by Fund Manager, Richard Rust, who is responsible for daily overall operation of the Fund (*id.*, Exhibit D thereto, p. 90),  that when assessing the partial withdrawal liability assessment, he had "no clue" there was a Labor Dispute Exemption in the Multiemployer Pension Plan Amendment Act of 1980 ("MPPAA"). *Id.*, Exhibit D thereto, p. 116. The Fund likewise concedes that since 2003, the hotel and the union "have been engaged in an *ongoing labor dispute*" and that "[*a*]*s a result of* that dispute," the union has remained on strike. Response p. 2; Rule 56.1 Fund Response, ¶13 (emphasis added). In addition, the Fund concedes that although there have been approximately thirty-six negotiation sessions between the parties, the parties have not yet entered into a renewed collective bargaining agreement. Response p. 2.

2

Consequently, the genuineness of the labor dispute is not and has never been in question.

The Fund also notes that during the strike, the hotel has used temporary replacements to perform the work previously performed by striking workers, and has not directly hired replacement employees to perform this work. Response, p. 2; Rule 56.1 Fund Response, ¶¶18-20. However, the Fund does not challenge the legality of the hotel's use of these temporary replacements to combat the strike and concedes that the union has never filed an unfair labor practice charge relating to the hotel's use of these temporary replacements. Rule 56.1 Fund Response, ¶21. One point of correction however is needed regarding this concession. In its Response, the Fund states that the hotel uses "subcontractors and *other third parties*" to replace the striking workers. Response, p. 3 (emphasis added). There has been no evidence presented at the hearing suggesting that hotel used "other third parties" as replacements. Mr. Souder testified that "several temporary agencies . . . send temporary workers over to us" and that anywhere from thirty to twenty cross-overs have come back to work. Rule 56.1 Fund Response, Exhibit D thereto, pp. 36-37; Rule 56.1 Congress Response,[1] ¶8.

The Fund also asserts as fact that the hotel entered into various extension and settlement agreements calling for it to carry on its legal obligation to continue contributing to the Pension Fund at the minimum required contributions that are mandated by the trustees on behalf of union employees who continue to work at the hotel during the strike. Response, pp.3-4. However, omitted from this assertion is the dire consequences that the hotel faced if it ignored this legal obligation. Had the hotel not entered into an agreement to pay rate increases set by the Fund, the

---

[1] "Rule 56.1 Congress Response" refers to Congress Plaza Hotel's Response to NRF's Statement of Material and Additional Facts.

3

Fund would have deemed the hotel to have withdrawn from the plan and would have assessed a compete withdrawal liability against the hotel. Rule 56.1 Fund Response, ¶30 and Exhibit D thereto, pp. 125-26.

## III.   **ARGUMENT**.

*A.     Standard of Review.*

Defendant misstates the standard of review that this court should follow by suggesting that *de novo* review is appropriate because the case involves the arbitrator's interpretation of the Labor Dispute Exemption. Review of an arbitrator's decision on whether the facts support a finding that a company is exempt from withdrawal liability is a classic example of a mixed question of law and fact. *Chicago Truck Drivers, etc. v. Louis Zahn Drug Co*., 890 F.2d 1405, 1409 (7th Cir. 1989). An arbitrator's factual determinations are presumed correct and may be overturned only if they are against the "clear preponderance of the evidence," 29 U.S.C. § 1401(c). Review of an arbitrator's determinations of mixed questions is done under the clearly erroneous standard, which the Seventh Circuit considers to be the functionally equivalent of the "clear preponderance of the evidence" standard. *Louis Zahn*, 890 F.2d at 1411. A finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. *Concrete Pipe & Prods. v. Constr. Laborers Pension Trust*, 508 U.S. 602, 622 (1993).

In this matter, the Arbitrator was required to make explicit findings of fact concerning the hotel's actions including  whether or not the decline in contributions was due to anything other than the labor dispute and whether the hotel was attempting to evade or avoid withdrawal liability. That latter determination has been explicitly ruled to constitute an issue involving a

4

mixed question of law and fact. *Louis Zahn*, 890 F.2d at 1412. To determine that there was a "suspension" of benefits, the Arbitrator found as fact that there was a lengthy and still active strike and that in order to combat the effect of the work stoppage, the Congress Plaza Hotel exercised its lawful right to use the services of workers employed by temporary staffing agencies whose contracts could be terminated by the hotel without notice. Rule 56.1 Fund Response, ¶51. The Arbitrator also concluded as fact that the hotel's use of these temporary agencies was a lawful attempt to combat the strike.  Plaintiff's Rule 56.1 Statement of Additional Material Facts ("Rule 56.1 Congress Additional Stats."), ¶2. Finally, in support of his finding that there was a "suspension" of contributions, the Arbitrator found as fact that where an employer carries out its lawful obligations to pay pension contributions on behalf of the small portion of workers returning to work during the strike but stops making pension contributions for those on strike-with the intent of resuming suspended contributions when the strikers return to work-the employer has in fact suspended contributions for those employers on strike. *Id*. ¶¶3-4.  By making these multiple factual findings and concluding that the hotel had "suspended" contributions, the Arbitrator has minimally made determinations involving mixed questions of law and fact which is subject to a clearly erroneous review.

A.    *No Legal Authority Supports The Fund's Distinction Between A Suspension Versus Reduction*.

The Labor Dispute Exemption of the MPPAA provides in relevant part that "[n]otwithstanding any other provision of this part, an employer shall not be considered to have withdrawn from a plan solely because– . . . (2) an employer *suspends* contributions under the plan during a labor dispute involving its employees. 29 USC §1398 (emphasis added). The crux of the entire partial withdrawal liability assessment imposed by the Fund appears to rest solely on

its use of selective portions of two dictionary definitions of the word "suspend" that include as

examples temporary cessations. The Fund asserts that a "suspension" in contributions only when

an employer "temporarily" stops payments. Response, p. 7. However, courts have cautioned not

to "make a fortress out of the dictionary." *Farmers Reservoir & Irrigation Co. v. McComb*, 337

U.S. 755, 764 (1949). Using secondary sources for the meaning of a word, especially where a

dictionary contains alternative definitions of the same word (as in this case) and there is no

evidence that the drafters were applying any particular textbook definition, is inconclusive of

legislative intent. *SKK, Inc. v. Cambridge Sys. Group*, 723 F.2d 553, 555 (7th Cir. 1983). Even if

this court were inclined to use alternative definitions found in the dictionary to decipher

Congressional intent, the Fund's argument is lacking logic and support on several grounds.

(I)     *The Fund Fails To Reference All Definitions Defining "Suspend."*

The dictionary "authorities" cited by the Fund (Response, p. 7) do not limit the definition

of "suspend" to simply temporary cessations. For example, in WEBSTER'S NEW

COLLEGIATE DICTIONARY (1980)(the year MPPAA was enacted), the definition of the word

"suspend" not only includes as an example a temporary cessation such as a suspension of a

student from school, but also defines the word to include "to stop payment or fail to meet

obligations." Certainly, the hotel's actions of not paying into the pension fund on behalf of

strikers could be characterized as stopping payments and would meet this portion of the

dictionary's definition of "suspend." A suspension can encompass both a temporary and lengthy

cessations. See, e.g., *In re Mitchell*, 901 F.2d 1179 (3d Cir. 1990)(suspension of lawyer from

practice of law remains until reinstatement granted). From this record, however, other than the

length of the dispute, there has been no evidence presented by the Fund that the reduction in

benefit contributions is anything but a temporary event. In fact, the Fund has stipulated to the genuineness of the labor dispute. Rule 56.1 Fund Response, Exhibit B, ¶11. The Arbitrator found that even defining suspend to mean a temporal event, the hotel's cessation in contributions for workers on strike with the intent of resuming those contributions when workers return to work constitutes a "suspension" of payments under this definition and cannot form the basis of a withdrawal liability assessment under the Labor Dispute Exemption. Rule 56.1 Congress Additional Stats., ¶¶3-4. This factual finding is entitled to deference as a mixed question of law and fact.

*(ii)     There Is No Legal Support For The Fund's Contention*.

The Fund argues that the Arbitrator's finding in this regard is erroneous because the Labor Dispute Exemption applies only when the employer "suspends contributions under the plan." Had the U. S. Congress wanted the exemption to apply to partial suspensions, it would have added the language "suspends contributions, *in whole or in part*, under the plan." Response, p. 8. However, the suggested wording offered by the Fund would simply add superfluous language to the statute. As written, the actual text of the statute does not limit its application to complete withdrawals. The introductory portion of the statute makes clear that the application is without limitation by including the language "[n]otwithstanding any other provision of this part,. . . ." 29 USC §1398. Other "parts" of the MPPAA include not only complete withdrawal liability assessments, but partial withdrawal liability assessments under 29 USC §1385(a)(1) including assessments involving greater than the 70% declines within the testing period. The use of the word "any" in the introductory phrase "[n]otwithstanding *any* other provision of this part, . . . ." is indicative of Congressional intent that the exemption apply "in whole or in part."

The Fund also takes issue with the astute observation of the Arbitrator that the Fund's argument is "wholly illogical" by claiming that the Labor Dispute Exemption should only apply to complete withdrawals (i.e., when no contributions are made) but not to decreases in contributions that trigger a partial withdrawal liability. Response, p. 8; Rule 56.1 Fund Response, Exhibit C, p. 20. Not only is this *not* a "personal view" of the Arbitrator (Response, p. 8), but it is a plainly obvious observation. It is indeed illogical for the Fund to claim that the Labor Dispute Exemption will prohibit a complete and partial withdrawal liability assessment when all the workers remain on strike but does not apply when an employer follows its lawful obligations by contributing to the fund for strikers who return to work.

Ironically, the Fund justifies its position with its own speculative suggestion of Congressional. It claims its position "*may reflect* Congress' desire" to avoid employers subcontracting out work and not paying into the fund instead of hiring workers directly and paying into the fund. Response, p. 9. However, no statutory language is cited to by the Fund to support this speculative guess of Congressional intent. The statutory language "[n]otwithstanding any other provision of this part" strongly suggests that the Labor Dispute Exemption will apply regardless of the type of withdrawal liability that is triggered. Although the Fund notes the Arbitrator's observation that the overriding intent of the statute is to protect the viability of multiemployer plans (Response, p. 9), the Fund fails to acknowledge that this stated intent contains an explicit limitation in the form of the Labor Dispute Exemption. Congress expressed an overriding desire to prevent the imposition of withdrawal liability assessments to be used to interfere with the course of a labor dispute. *New York Teamsters Retirement Fund v. McNicholas Transportation Co*., 848 F.2d 20, 22 (2d Cir. 1988).

8

The Fund also takes issue with the hotel's reliance upon *T.I.M.E. D.C., Inc. v. I.A.M. National Pension Fund*, 597 F. Supp. 256, 263, f.n.4 (D.D.C. 1984). Response, p. 9. However, the case is particularly noteworthy for the court's early characterization of the failure to make contributions during an on-going labor dispute as a "suspension" rather than a termination of payments. The case also undermines the Fund's claim that a "reduction" in payments due to a labor dispute is anything but a suspension of payments.

Finally, the Fund disputes the hotel's observation that adopting the Fund's position would result in a situation where the Labor Dispute Exemption would never apply in a partial withdrawal liability case where the decline was greater than 70% and less than 100%. Response, pp. 9-10. The Fund counters this contention by asserting that there could be a "suspension" in a partial withdrawal liability case where for example there was a non-payment period involving a "a certain period of months."  However, this dissection of the application of the Labor Dispute Exemption again has absolutely no legal support and would leave the imposition of withdrawal liability assessment to the discretion of the union. A union involved in a labor dispute would have the power to avoid the application of the Labor Dispute Exemption by encouraging just one of its striking workers to return to work. Equally important, the Fund fails to identify any instance where an employer failing to pay into a fund for "a certain period of months" would *ever* trigger a partial withdrawal liability assessment. In the assessment made against the hotel for example, the Fund relied upon each of the three testing years to render a partial withdrawal liability assessment. Rule 56.1 Fund Response, Jt. Ex. 6. The 2005 test period on the other hand involved low payments for only 2004 and 2005 but since 2003 contained larger contributions,[2]

---

[2] The strike began in June 2003.

the three year cumulative decline was insufficient to trigger a partial assessment for this period. *Id*. As such, the Labor Dispute Exemption and the application of the "suspension" term would likely never occur in a period involving nonpayment for "a certain period of months" as suggested by the Fund. Further, an employer paying into the fund for a three year period on behalf of just one striking worker would be subject to the partial assessment while an employer who had no cross-overs would entirely avoid assessment under the Fund's example. The Arbitrator was correct in characterizing this contention illogical.

The idiosyncrasy of a struck employer's obligation to make pension contributions on behalf of cross-overs (its own employees who have returned to work during a strike) but not employees of third party contractors performing unit work during the same strike should not be perverted into a triggering mechanism which adds a withdrawal liability assessment to that struck employer's burdens. The Labor Dispute Exemption was designed to prevent injection of withdrawal liability issues into the economic dynamics of that labor dispute and acts as the statutory quarantine of withdrawal liability assessments during a labor dispute.

B.     *The Fund Fails To Sustain Its Burden Of Proof To Overturn The Arbitrator's Factual Finding That The Suspension Was Caused By The Labor Dispute*.

The Fund next takes issue with the Arbitrator's finding of fact that the suspension was *"because of* the labor dispute." Response, p. 10 (emphasis added). Without any legal support, the Fund characterizes this finding as a legal conclusion. However, it has long been the rule that the cause of an event is a question of fact. *Camp v. TNT Logistics Corp*., 553 F.3d 502, 506 (7th Cir. 2009). This finding is entitled to a presumption of correctness and the Fund fails to satisfy its burden that is against the "clear preponderance of the evidence." 29 U.S.C. § 1401(c).

Just as Arbitrator Jaffe was correct in ruling that the suspension in payments in 2004 and

2005 were "because of" the labor dispute, Arbitrator Irvings was likewise correct in concluding

that the suspensions in payments analyzed in a portion of those same testing years, 2004, 2005,

and 2006, were "because of the labor dispute." The event first precipitating the suspension in

payments was the workers going on strike and the Fund never has questioned the genuineness of

the labor dispute. The Fund argues that it was the hotel's exercise of its legal right to use

replacement workers to combat the strike,  not the labor dispute, that caused the decline in

contributions. Response, p. 10. The Fund's attempt to dictate to the hotel that it should forgo this

recognized right and instead hire workers directly is precisely what the U.S. Congress intended

pension plans not do: i.e., interfere with the lawful course of labor disputes. *McNicholas*, 848

F.2d at 22.  Justifying an assessment because an employer exercised its lawful right to use

replacement workers (*NLRB v. Mackay Radio & Telegraph Co.*, 304 U.S. 333, 58 S. Ct. 904

(1938); *520 S. Mich. Ave. Assocs. Ltd. v. Devine*, 433 F.3d 961, 965 (7th Cir. 2006)) instead of

hiring workers directly would eliminate the protections afforded in the Labor Dispute Exemption

through the threat of multimillion dollar assessments.

Like the National Labor Relations Board, the Fund cannot interfere with the manner in

which the parties conduct their labor dispute; it cannot be an "arbiter of the sort of economic

weapons the parties can use in seeking to gain acceptance of their bargaining demands." *NLRB*

*v. Insurance Agents*, 361 U.S. 477, 497 (1960); *NLRB v. Brown*, 380 U.S. 278, 283 (1965).  As

long as those weapons – including the use of replacement workers – are lawful, the full freedom

of economic warfare is not to be limited or diminished including the insulation provided within

the Labor Dispute Exemption. *NLRB v. Local Union No. 1229, IBEW*, 346 U.S. 464, 480 (1953)

(Frankfurter, J., dissenting).

In attempting to explain that the decrease in contributions were not "because of" the labor dispute, the Fund offers an analogy that the outcome would be the same if there were no labor dispute and the hotel hired replacement workers. Response, p. 11. However, it is the existence of an actual labor dispute that is the critical fact distinguishing the Fund's analogy and places the assessment squarely within the protections offered by the Labor Dispute Exemption. In the Fund's analogy, the workers are not being used as part of the labor dispute and consequently, the Labor Dispute Exemption would not protect the employer. Based on the evidence produced at the hearing, the Arbitrator was correct in rejecting the Fund's argument that the greater than 70% decline was *not* the result of the strike (Rule 56.1 Congress Additional Stats. ¶5), and finding as fact that the decline in contributions was directly caused by the strike, and but for the strike, the hotel would not have contracted with outside agencies for temporary replacements. *Id.*, ¶6.

C.      *The Fund Fails To Quantify Its Claim Of Harm.*

Any pension fund that is barred by the Labor Dispute Exemption from assessing withdrawal liability can claim financial "harm." However, as stated above, the U.S. Congress recognized this competing interest and determined that this interest is outweighed by the nation's interest in preventing an employer from incurring costly withdrawal liabilities during a strike. Although the Fund claims its is harmed by the arbitration decision, it offered no mathematical computations at the hearing to analyze if there is an actual harm and if so, how much. For example, the size of the bargaining unit was approximately one hundred and thirty workers just before the strike and during the course of the strike, approximately thirty workers returned to work. Rule 56.1 Congress Additional Stats., ¶7. Without a comparison by the Fund of the number of plan participants, the Fund is unable to offer a definitive comparison of its actual

harm. Even if such a number were presented at the hearing, it is questionable whether the Fund could show an actual harm since none of the strikers were accruing further benefits while striking. Pension contributions however were continuing to be paid on behalf of strikers who returned to work and who were continuing to accrue benefits. Although disputed by the hotel, the Fund's statement of material facts alleges that employers merging from an underfunded fund actually receive a lower benefit of accruals relative to the amount of contributions it paid to the NRF. Rule 56.1 Congress Response, ¶5. From these facts, it appears that the Fund will suffer no harm by the lack of contributions made for striking workers. This court should note that when opposing the hotel's motion to escrow the contributions ordered returned, the Fund represented to the court because its was financially solvent, it did not need to escrow these contributions.

Although the Fund takes note of the strike's length (Response, p. 11), this strike is not the only lengthy labor dispute to occur since the passage of the MPPAA. In *T.I.M.E.-DC, Inc.* for example, although the withdrawal liability assessment was issued September 14, 1984, the employer had ceased paying into the fund as far back as 1981. *T.I.M.E.-DC, Inc.*, 597 F. Supp. at 257-259. *Bud Anele, Inc.*, 347 NLRB 87 (2006) involved a fourteen year lockout. Nothing within the MPPAA indicates that the U.S. Congress sought to impose a cut-off date on how long the Labor Dispute Exemption could last.

Finally, the Fund's claim that the hotel's agreement to the minimum funding obligations imposed by the Fund is somehow an unlawful attempt to "evade or avoid" liability under the MPPAA is incredible. Response, p. 12. Prior to 2003, the hotel agreed to minimum funding increases as they were set from time to time by the plan and there is simply no evidence that the Fund claimed at that time that these agreements constituted an *unlawful* attempt to evade or

avoid liability under 29 USC § 1392(c). Regardless, employer proposals made during negotiations toward a collective bargaining agreement, and motivated, at least in part, by a desire to minimize withdrawal liability, are not transactions entered into in order to evade or avoid withdrawal liability within the meaning of 29 U.S.C. § 1392(c). *Cuyamaca Meats, Inc. v. San Diego & Imperial Counties Butchers' & Food Employers' Pension Trust Fund*, 827 F.2d 491, 499 (9th Cir. 1987).

D.      *The Partial Liability Is Barred By Collateral Estoppel.*

        The Fund also argues that the hotel was obligated to bring a complaint to modify the arbitration award if it sought to enforce the award on the alternative ground that the award is barred by collateral estoppel. Again, the Fund offers no legal citation for this proposition. This court on review may affirm the arbitrator on any ground.

E.      *Interest Should Be Paid By The Fund At The Ordered Rate Until The Payments Are Actually Tendered To The Hotel.*

        The Fund argues that it should not be required to pay interest at the ordered eight percent rate because it no longer has the funds. Response, p. 14. However, the Fund has objected to the hotel's receipt of these contributions and as such, is the sole impediment to its receipt of the monies that the Arbitrator ordered be returned immediately. Until the Fund complies with the arbitration order to "immediately refund to the employer" the lump sum payment with interest, the eight percent interest rate should continue to accrue against these funds.

F.      *As A Prevailing Party, The Hotel Is Entitled To An Award Of Attorneys Fees And Costs.*

        As Judge Holderman noted in awarding the hotel its attorneys fees and costs in the first affirmation of the arbitration award, if the hotel prevails in affirming the award, it is presumptively entitled to an attorneys fees and costs award under 29 U.S.C. §1451(e); *Anita*

14

*Foundations, Inc. v. ILGWU Nat'l Retirement Fund*, 902 F.2d 185, 187 (2d Cir. 1990). Although

the Fund asserts it has not brought this appeal in bad faith, it is evident that the Fund relied upon

little or no legal authority to support its position. Its primary reliance on dictionaries to derive

statutory intent and support its multi-million dollar assessment is indicative of bad faith and lack

of relative merits of the Fund's positions. Under the factors cited in  *Hummell v. S.E. Rykoff &*

*Co.*, 634 F.2d 446, 453 (9th Cir. 1980), the hotel should be reimbursed its attorneys fees and

costs.

Respectfully submitted,
**Congress Plaza Hotel & Convention Center**

By:_____/s/Bradley Wartman_____
        One of its attorneys.

Peter Andjelkovich, Esq.                          Alan Levy
Bradley Wartman, Esq.                            Lindner & Marsack
Peter Andjelkovich & Associates             411 E. Wisconsin Ave Suite 1800
39 South LaSalle Street, Suite 200           Milwaukee, WI 53202-4498
Chicago, IL 60603                                    414-273-3910
312/782-8345